Bonilla, was soon hired by Kingsland Developments Inc., S.A. Lastly, Defendant Shelly Bruno was named Secretary and her expertise was also in Construction and she too was a Licensed Realtor in the State of Arizona with the Firm of Remax2000. In the Corporate Documents it states that the Board of Directors would receive 30% Management Fees and a Salary of $6,000.00 US per/officer, per/mo. (though at no time were these funds regularly available). **Original Corporate Books and Records are located with attorney, Mario Soto, in San Jose', Costa Rica and are written in Spanish.**

24. It was decided that Kingsland would begin raising funds for the land purchase, while at the same time pursuing Building Permits for the proposed Condominium Project, Coco Vista. It took a couple of months for Kingsland to get a Bank Account set up in Costa Rica as their banking laws require more paperwork to be filed prior to opening one. Plaintiffs allege that monies for investment were sent to several different accounts belonging to the Defendants. This is true; Defendants maintained a checking account in the U.S. called James Bruno Enterprises, LLC, in Washington Mutual - most of the monies being initially collected were sent to this account and then forwarded to either the Sellers account or to Attorney, Montealegre's, Trust Account for distribution as needed on the project. Another account maintained by Defendants, Bruno, was known as Pangaea Properties, LLC (this company long-since disbanded) located in Bank of America. Funds were sent to this account by only one Investor, Mr. Mark Woodward, who did not have access to Washington Mutual Bank owing to his residence in Massachusetts where WAMU was not located. Roetman Bruno Investments, LLC, in Chase Bank, was the third account in the U.S. that received investment monies destined for Costa Rica, set up by Craig Roetman and Defendant, James Bruno to become the primary receivership account for all monies going to the Costa Rica Project and relieve Defendants, Bruno, from having to use their own business accounts. Finally, Kingsland did have opened up an account at Banco Cuscatlan, in Costa Rica, where Investors were encouraged to send their monies directly and ALL condominium pre-sales monies were sent directly to this account. **See Attached Accounting**

25. Between 2006 and 2007, only $1,995,000.00 worth of Shares had been sold and $200,000.00 of that had been purchased by Defendants, James and Shelly Bruno, as their direct investment in the Corporation.( Please not also that Accounts Payable - Owners, in the Accounting, is monies loaned to the Company by the Defendants, and owed to them outside of their Shares in the company) By the end of 2008, when the project was officially halted, there were still $200,000.00 outstanding in Shares not sold. The Seller, Mike Bragg received the largest portion of this amount in the form of Principal and Interest Payments, as he was aware that the Company was going for Permits and was content with getting Interest payments on the balance of the Purchase Contract, with periodic larger Principal payments as well. The shareholders as well knew that we had been raising money all along with the sale of Shares and that the Property had not been purchased outright as the Plaintiffs allege. In fact, Plaintiffs (and Shareholders) Tom and Andrea Riles, were present at a meeting between Kingsland Officers and Seller, Mike Bragg, in June, 2006, to renegotiate the terms of the Land Purchase and set the amount of Interest Payments at $10,800.00 per/month. **See Defense Exhibit "K"**
26. Plaintiffs were also aware at all times that Kingsland was pursuing Permits for the construction of condominiums and that monies were being spent in that direction. **See Defense Exhibit "L"**
27. By August, 2006, it became evident that a full-time presence was necessary in Costa Rica to pre-sell condominiums thereby raising cash for the project which was always in short supply. Defendant James Bruno was spending 7 - 10 days per/month in the Country trying to conduct the business of the Company. The President, Craig Roetman, was accompanying him about half of that time, if pressed. Kingsland had a fully staffed sales office in Playa Del Coco and from day one, it was assumed that Craig Roetman would be in Costa Rica on a semi-full-time basis to conduct the sales for the Company as he was a single man with no children in the U.S. to tie him down unlike Defendant, James Bruno. Defendants James and Shelly Bruno began pushing Mr. Roetman to hold up his end as the Salesman for Kingsland and move to Costa Rica for awhile

but he balked at the idea and began searching for an outside sales team to hire to do his job. Defendants James and Shelly Bruno seriously considered relocating themselves at this point but had three children at home, two teenagers in High School, one who was a Senior, and another in Junior High, and could not in good conscience force them to move to a foreign country.

28. In the meantime, expenses were mounting daily; Principal and Interest Payments to the Seller, Mike Bragg; A fully-staffed office with 2-3 employed at all times, rent, utilities, office supplies, and sales tools; An Attorney, Accountant, Architect, and Engineers were working for Kingsland; Advertising via printed materials, billboard, signage, t-shirts, magazines, (television and radio later on), website etc. were an ongoing expense; Defendants, James and Shelly Bruno paid for many of these expenses out of their own pockets as Kingsland was always tight on funds. Mr. Roetman contributed nothing financially and it was apparent that he was reneging on his promise to lead the Sales of the Project. **See Attached Accounting**

29. On or about November 30, 2006, Kingsland Developments, represented by President, Craig Roetman, and it's Treasurer, Defendant James Bruno, entered into an Exclusive Real Estate Brokerage Commission Agreement with Crystal Clear Properties C.C.P., S.R.L., a Costa Rica Corporation, represented by Jason LaFlesch to conduct the exclusive sales of Coco Vista for a period of One Year, subject to renewal.

30. In the Exclusive Agreement with Mr. LaFlesch, he agreed to assume the Lease of the Office in Playa Del Coco (Paragraph 17. "Office" in Contract) and have it staffed with one of his own team that would work on the sales in Costa Rica and be available to show Coco Vista project (property, architectural renderings, attractions in the area, etc.) to any prospective buyers who were sent down there for the purpose of purchasing a condominium in Coco Vista. (Mr. LaFlesch never did honor this Clause) **See Defense Exhibit "N"**

31. Mr. LaFlesch set up his associate, Mr. Jack Gee, in Playa Del Coco as his representative there while he set about conducting sales seminars and advertising Coco Vista in the States. Mr. LaFlesch sold 22 condominiums over

the span of 6 or 7 months taking a 10% deposit on each of them and said deposits being sent directly to Kingsland bank account in Costa Rica, but, there was a problem in Costa Rica: Mr. Gee allegedly had been taking potential clients that we had sent down to view the project and a few of the actual purchasers when they went down to view the project, to another project further south of Playa del Coco, called Jaco, that he and Mr. LaFlesch were also involved in, with the intent of dissuading them from Coco Vista. These acts were witnessed by Kingsland's Office Staff still working in the office and relayed to Defendants and Mr. Roetman. Three sales were cancelled after these visits and when the purchasers were questioned by Kingsland Representatives, they claimed they were never even shown Coco Vista and felt like they had been completely misled by Mr. LaFlesch and his sales team and promised things they never received when they purchased their condominium units. Mr. Laflesch had also been paid a 1% advance on his commissions for each completed sale. **See Defense Exhibit "O"**

32. Defendants, Bruno were diligently pursuing Permits for the project which was taking all of their time and energy and were frustrated by their inability to get anywhere. Mr. Roetman was still trying, unsuccessfully, to sell the remaining Shares in Coco Vista and Mr. LaFlesch's team had pretty much ceased pre-selling condominiums for a few months prior to his year Contract expiring, due to the seriously deteriorating relationship between LaFlesch and Kingsland Officers.(Said Contract was not renewed). Monies for the project were running out by the end of 2007 when Kingsland finally got approval (permits) to begin some of the Infrastructure on the Project. **See Defense Exhibit "P"**

33. On or about January 14, 2008, Construction began on-site at Coco Vista for the items Kingsland had been granted Permits to do as shown on Defense Exhibit "P". At this time, per/Contract, a second 10% Deposit was required from the Purchasers of Coco Vista and they were duly notified of this by Kingsland Developments. These funds were earmarked with the larger portion going to the Seller, Mike Bragg, to pay down the Principal, and the remainder to be used for the Infrastructure costs and final Permit Fees to

the Architect, Braulio Ubilla, and Engineer, Helga Ruiz. Once Final Permits were received, Kingsland had been working with two different lenders to supply the Company with a Bridge and/or Construction Loan which would take out the Seller completely and allow for Phase I to be built.

34. On or about January 16, 2008, Jason LaFlesch contacted the Purchasers and told them not to send their second 10% as Kingsland did not have Final Permits yet thus halting the project completely due to lack of funding, even though Construction had begun and equipment was on-site working, and it was in the Purchase Contract that the monies were due when "Construction Started", not when Final Permits were in hand. **See Plaintiff Exhibit G**

35. Relations between Kingsland and LaFlesch deteriorated completely by this time and LaFlesch had begun badmouthing the project and it's Officers to any and all who would listen. A Shareholder Meeting was held in Playa Del Coco in April, 2008, with proxies from most Shareholders in lieu of attendance at this meeting. Mr. LaFlesch did attend and set out to disrupt the meeting from the start. Contrary to the Plaintiff's claim, the Shareholder Meeting did not end prematurely, Mr. LaFlesch left the meeting prematurely. After the meeting, Shareholders received copies of the complete Accounting from the time of the Company's inception to date and a summation of the Minutes of the meeting as they were in Spanish. Attorney, Alejandro Montealegre, was requested to provide a translation of the minutes by Kingsland Officers, but never did.

36. Not long after this Shareholder Meeting, Attorney, Alejandro Montealegre, was mutually released from remaining as Kingsland's Council in Costa Rica for many reasons not least of which was the continued inability to obtain the Final Construction Permits for Coco Vista despite claims over the past year that we would have them in 2 months,- every 2 months, and the Accounting, which Defendants, James and Shelly Bruno, and President, Craig Roetman, were demanding a more detailed one than was currently being provided by the Accountant. 100's of Receipts for ALL expenses made by Kingsland Officers in the course of business, cash and otherwise, for things like gas/diesel, meals, lodging, office equipment and supplies detailing

purchases for paper, computer (most of which were purchased here in Arizona and taken to Costa Rica by Defendants), etc., had been provided all along to the Attorney for him to pass on to the Accountant. What the Company was receiving back was a generic accounting that did not specify exactly what the monetary amount was for, as Defendants wanted. Plaintiffs allege that the Accounting does not meet some particular standard in Accounting. Defendants only know that it was not acceptable as it was being done and went round and round with the Attorney and Accountant over this issue. The Kingsland Bank Statements from Banco Cuscatlan were also an unacceptable means of identifying expenses as they were in Spanish, and except for the specific checks listed, again did not specify where and for what, debit purchases had been made. A lot of the Checks written to individuals were also not satisfactorily detailed in the Accounting as Defendants wanted. Please note also that Attorney, Alejandro Montealegre, had been a signatory on the Kingsland bank account for some time owing to the need for someone in Costa Rica to be able to sign checks and pay necessary fees when due, as Roetman and Bruno's could not or would not, (In Roetman's case), be there on a full-time basis. The fact that none of the Company's paperwork and Documentation was being provided to Defendants and Roetman in English, despite repeated requests for it, was also a key factor in the separation of Kingsland and said Attorney.

37. Alejandro Montealegre was replaced by Attorney, Mario Soto Baltodano, as Council for Kingsland Developments in or about May, 2008.

38. During this time period between January and April, 2008, the Seller, Mr. Mike Bragg, was also getting frustrated by the fact that he had not received a payment towards the Principal in quite some time as promised nor was he receiving Interest Payments by then because Kingsland Developments was basically broke and Defendants, James and Shelly Bruno, had drastically depleted their own funds over the years on this project. In February, 2008, Kingsland put out a letter to the Shareholders requesting a deposit of an additional $5,000.00 per/shareholder, for additional shares of course, in order to give the Seller a payment. If everyone would have put that amount

10/06/2009

in, $150,000.00 could have been raised immediately and would have bought the Company more time with the Seller. As it was, only two shareholders put in the money, the rest declined and the Seller began Foreclosure Proceedings on the Property in May, 2008. **See Defense Exhibit "Q"**

39. In or about May, 2008, Mr. Roetman resigned as President of Kingsland Developments because he couldn't handle the difficulties that had overtaken the Company that HE began and left the Defendants, James and Shelly Bruno, to try and make things right with this project for everyone involved.

40. With the assistance of Kingsland's new Attorney, Mario Soto, Defendants Bruno began to try and find out exactly what the situation was with the Permit Process as they had no faith in anything they had been told up to that point in time by the former Attorney, Alejandro Montealegre. Discussions with the Architect, Braulio Ubilla, the Engineer, Helga Ruiz, and a third party hired by Kingsland to investigate, showed that most of the approvals had been received by the various agencies except for the main Permit which was only awaiting an approval from The AYA, the Water Company in Costa Rica, showing that Kingsland had the water connections to build the condominiums. Kingsland had already deposited $80,000.00 with The AYA about a year and a half prior to this which purchased 28 connections, and one connection was already located on the Property to total 29 water connections. This was not enough to connect the full scope of Phase I so with the Architect, it was decided that the scope of Phase I would be reduced to accommodate the connections Kingsland did have. This reduction in scope would have still allowed for the units to be built that had already been pre-sold with about 10 left over to sell. This would have satisfied The AYA requirement and allowed our Permits to be issued.

41. Unfortunately, the Company did not have any money to do anything and Defendants, James and Shelly Bruno, had no more funds to expend on this project so everything was put on hold pending obtaining a Bridge Loan for the Company in order to proceed. So, Defendants set out to obtain a Bridge Loan for the Company.

42. Meanwhile, an issue was developing that was to have considerable impact on the future of the Project. As was earlier noted, it was necessary to have the approval of the water connections from The AYA in order to obtain the final Permits for the project; In March, 2006, when the property was purchased, the Seller, Mike Bragg, assured us that we had guaranteed water availability on-site. By June, 2006, we had heard talk of a situation developing in Playa Del Coco, that with all of the new construction going on, the current water delivery system was not going to meet the areas needs. A consortium of developers in Coco, including Kingsland Developments, joined the newly formed Coco Water Board, set up for the purposes of constructing a new aqueduct system and new, larger water storage tanks, in conjunction with The AYA, in Coco, thus guaranteeing enough water for all. Each developer had to list the size of development and how many water meters they would need and put in 50% of the funds to pay for them upon joining. Kingsland put in its 50% which was $80,000.00. (Originally, a lot of developers joined which brought the price of the meters down, this would have purchased approximately 130 meters for Kingsland. Unfortunately, a lot of them never put their monies in and the price per/meter skyrocketed and this amount ended up purchasing only 28 meters) By January, 2008, AYA had begun the work on the new Aqueduct System and the installation of the water tanks in Coco. The water tanks adjoined Coco Vista property and they in fact had an easement through the Property to access them. The Aqueduct had to travel from inland to the coast where Playa Del Coco was located and through other towns located along the way. The town of Sardinal was the next town inland from Coco and when they saw the Aqueduct running through their town, but not benefitting them in any way, they rioted, literally. It became such an issue in the entire Province of Guanacaste that the Aqueduct Project was completely shut down by the Government and The AYA was being investigated. The Coco Water Board was taken over from The AYA by the Government and its monies deposited by the developers were put in a Trust Account administered by the Government and became untouchable for a considerable amount of time. Construction of all kinds ground to a halt in Playa Del Coco because of

this. (The wheels move very slowly in Costa Rica and as of this writing, 10/09, the matter is still not settled and the Aqueduct Project nor the water tank installations have been re-started) But, as stated earlier, Kingsland did have 28 water meters already purchased and the current water delivery system in Coco would have accommodated the reduced size of Phase I.

43. In September, 2008, Defendants James and Shelly Bruno went to Costa Rica with a representative of a company, named Ken Schneider, of American Bridge Funding, located out of New Jersey, who had all but guaranteed providing a Bridge Loan to Kingsland pending a site review and due diligence investigation. Defendants, Bruno, had pre-paid 1 point and loan application fees based upon this "sure" thing, with monies borrowed from a family member totaling $32,500.00. When the due diligence turned up the water problem, the loan was rejected and Defendants (and the family member) were now out even more money as the fees were non-refundable. **See Defense Exhibit "R"**

44. Discouraged but undaunted, Defendants, James and Shelly Bruno continued to look for funding for the project with the help of one of their contacts in Costa Rica, Attorney Leo Gomez. Two different groups were interested in funding the project and one of them was set to go in February, 2009, when at final Title Search, prior to funding the Loan, there appeared a Lawsuit filed against the Property by none other than Mr. La Flesch and company. It was over, Defendants realized that nobody would fund a project with a Lawsuit against it and the Seller, Mike Bragg, Foreclosed on the property on or about March, 2009.

45. On a final note, Defendant James Bruno recently spoke with the Seller, Mike Bragg, who would probably still work a plan with Kingsland to pay off the balance on the Property plus some Attorney Fees in the amount of $800,000.00. The Property is still in Kingsland Developments name as the Seller claims it will cost him a lot of money to have it transferred back into his name, and he claims to have cleared the Lawsuit off the Property. Defendants also are aware that by Costa Rica Law, the Seller cannot sell the property to anyone else for two years after a Foreclosure. If a useful dialog could have been instituted a long time ago with reasonable heads in

the Group, things probably would never have come to this and with some optimistic creativity, the Project could probably be salvaged even today.

46. Defendants, James and Shelly Bruno, never committed fraud in the course of doing business not did they operate a "Ponzi" type scheme. Everyone involved in the project was well aware that it was land speculation and that all investments could be at risk. Defendants were probably naïve going into a foreign country and doing business but never intentionally performed any wrongful acts in conducting it there. The Seller, Mike Bragg, in fact put it quite succinctly at one point well into the project, and still with no permits, by stating "We were paying the wrong people". Defendants, James and Shelly Bruno, never stole money from the Company, but in fact went broke themselves by personally funding the project over the years. Defendants have no hidden assets and in fact have lost almost everything they owned here in the U.S. Defendants own no property outside of the United States since their interest in condominiums they owned, with partners, were sold long ago and those monies dumped into Kingsland Developments. Defendants have no hidden bank accounts here or abroad with any money in them. Defendants paid $200.00 for a Document Preparer to File this Chapter 7 Bankruptcy and obviously do not have funds to hire an Attorney to represent them in this action as it is done Pro Per.

**DEFENDANTS ANSWER TO OTHER ALLEGATIONS**

47. Defendants were purchasing a piece of undeveloped Property located in St. Johns, Arizona. Defendants were unable to keep making their monthly payments in the latter half of 2008 and have since let that property go.
48. Defendants were purchasing a piece of undeveloped land in Oregon State. Defendants were unable to make the monthly payments on that piece of Property and have since let it go as well. **See Defense Exhibit "S"**
49. The Property known as 390 Van Deren, Sedona, Arizona, is a property being purchased by the Defendants from the Owner, Francois Geis, in 2007, as an Owner/Seller wrap, and thus Defendants were never on the Loan to date. This property however, IS listed and disclosed in the Defendants Chapter 7 Filing under "Creditors Holding Secured Claims", and by the fact of the upside-down

mortgage currently on the Property, can hardly be called an asset. Defendants are behind on the monthly payments and have been trying to work with the Owner/Seller (who is and has been residing in Spain for the past year) to get his loan on the Property restructured, before it too is lost.

**DEFENDANTS REQUEST FOR DISCHARGE OF DEBT**

**50.** Defendants, James and Shelly Bruno herein request a complete Discharge of the Debt in this Complaint and all of the Claimants Debts attached to it, now and in the future, against Defendants James and Shelly Bruno, individually and doing business as: James Bruno Enterprises, LLC, Bruno Family Trust, Roetman Bruno Investments, LLC, ILX-Bruno, LLC, Bruno I, LLC, Bruno II, LLC, and any other dba's used in the past, present or future by Defendants, James and Shelly Bruno. Defendants also ask that the Discharge include their roles as Treasurer and Secretary of Kingsland Developments Inc., S.A., against future Lawsuit actions here in the United States as that Company's proper venue is in Costa Rica. Defendants did not commit any fraud or benefit financially from any of their business dealings disclosed herein and documentation has been provided to the Attorney's for the Trustee assigned to Defendants Chapter 11, (Allen, Sala, and Bayne, for Trustee, Maureen Gaughan), that should collaborate the facts and disprove the claims of fraud etc. when their investigation of said documents is complete.

10/06/2009